**Pages 1 - 11**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

IN RE VOCERA COMMUNICATIONS,   )
INC. SECURITIES LITIGATION,    )
                               )    NO. C 13-03567 EMC
                               )

San Francisco, California
Thursday, March 3, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
        LABATON SUCHAROW LLP
        140 Broadway
        New York, New York 10005
   **BY: NICOLE M. ZEISS**
       **JONATHAN GARDNER**
       **ATTORNEYS AT LAW**

For Vocera:
        ROBBINS, GELLER, RUDMAN & DOWD LLP
        Post-Montgomery Center
        One Montgomery Street - Suite 1800
        San Francisco, California  94104
   **BY: SHAWN WILLIAMS**
       **ATTORNEY AT LAW**

For Defendants:
        FENWICK & WEST
        555 California Street - 12th Floor
        San Francisco, California  94104
   **BY: KEVIN P. MUCK**
       **MARIE BAFUS**
       **ATTORNEYS AT LAW**

Reported By:     Rhonda L. Aquilina, CSR #9956, RMR, CRR
                 Official Court Reporter

```
 1   Thursday - March 3, 2016                              2:05 p.m.
 2                      P R O C E E D I N G S
 3                             ---oOo---
 4        THE CLERK:  Calling case C-13-3567, In Re Vocera.
 5     Counsel, please come to the podium and state your name for
 6   the record.
 7        MS. ZEISS:  Good afternoon, Your Honor.  Nicole Zeiss
 8   from Labaton & Sucharow on behalf of the lead plaintiffs and
 9   the class.  With me is my colleague Jonathan Gardner.
10        THE COURT:  All right.  Thank you.
11        MS. ZEISS:  Good afternoon, Your Honor.  Shawn
12   Williams, Robbins, Geller, Rudman & Dowd on behalf of the
13   plaintiffs.
14        THE COURT:  All right.  Good afternoon.
15        MS. MUCK:  Good afternoon, Your Honor.  Susan Muck,
16   Fenwick & West, on behalf of Vocera and the individual Vocera
17   defendants.  And with me is my colleague Marie Bafus.
18        THE COURT:  All right.  Welcome.  Good afternoon,
19   Ms. Muck.
20     We're on for parties' motion for preliminary approval of
21   the proposed class.  And I appreciate the supplemental briefing
22   in response to the Court's question, and I think nearly all of
23   that has been responsive to some of the things that I have
24   asked.
25     I know there's some back and forth on the issue of the
```

1  released claims, but the bottom line, as I understand it, is
2  that the inclusion of underwriters and directors as
3  releasees -- they're included as releasees, but they're not
4  necessarily signatory to this agreement.
5          **MS. ZEISS:**  That's correct, Your Honor.
6          **THE COURT:**  And which is not necessarily, you know,
7  inherently a problem, because it is not uncommon to include
8  releasees that are not parties.  Here, they have been named, I
9  guess that's what makes it a little unusual, and then they were
10 not named.  But I can understand why relief and scope of
11 release sought by the defendants wouldn't want to concede
12 that -- of those named.  But then it does inform sort of the
13 value of the settlement, because that shows you're giving up
14 more than if you just narrowly release those who were parties.
15 But I don't have an inherent problem with that.  I think it
16 feeds into the next question, and that is, is this a fair and
17 appropriate settlement.
18     And here, it seems that question turns in part not only on
19 the litigation risks, but in the damages assessment.  There
20 seems to be a wide range of potential damage assessment here.
21 And correct me if I'm wrong, but I take it that a large part of
22 this has to do with what is deemed to be a corrective
23 disclosure or complete corrective disclosure, because that sets
24 the benchmark, and that, depending on which one you choose,
25 there's a pretty wide swing in terms of the pricing; is that

1  correct?
2  **MS. ZEISS:** Yes, Your Honor. We have two disclosures,
3  alleged disclosures here: One in February, and one in May.
4  The May disclosure, we allege, represented about 75 percent of
5  aggregate damages. Also, defendants, of course, contested that
6  we would be able to disaggregate confounding information on
7  both of those disclosures from information connected with the
8  alleged fraud.
9  Here, we also had issues about when locked up shares
10 traded after the IPO and the secondary offering that would
11 impact the number of damage shares and also the aggregate.
12 **THE COURT:** So explain that. How does the issue about
13 the lockup share at the end of the lockup period, how does that
14 affect, maybe you could just describe to me?
15 **MS. ZEISS:** Sure, I will try. And if I haven't
16 answered your question, I am going to ask my colleague to step
17 up.
18 So at the end of the IPO, a certain number of shares were
19 allowed to be traded by insiders. There were different models
20 for factoring in when those shares actually went into the
21 market. Under one model that was at the higher end of the
22 damages range, the shares all immediately traded shortly after
23 the lockup period expired.
24 **THE COURT:** Why would that be an unknown when the
25 locked up shares went into the market? Is that something that

1  is ascertainable?
2       **MS. ZEISS:**  No.  Well, the nominees -- that goes back
3  to the issue of shares being held in street name.  And Vocera
4  doesn't necessarily have all the names of people who have
5  traded.  The brokers would have the names, and that information
6  would need to come from the brokers.
7       **THE COURT:**  That had not been ascertained?
8       **MS. ZEISS:**  Correct.  And that information is
9  ascertained through a claims process.  If this proceeded to
10 trial, we also, after a verdict, would have had a claims
11 process to figure out when people actually bought their shares.
12      **THE COURT:**  So until that claims process, there's no
13 way of knowing.  There's some guesstimation as to the
14 correlation and timing.
15      **MS. ZEISS:**  Yes.  Unless you're a very large
16 shareholder, and you have to file a Form 13-F with the SEC.
17 There are other ways that you could -- the arrangement would be
18 disclosed, but they're pretty few and far between.
19      **THE COURT:**  Okay.
20      **MS. MUCK:**  And just to add one point, Your Honor.
21 Both of us did have experts, respective experts looking at
22 this, and while we may not agree on the precise number of
23 shares that might have been entering the market at various
24 points in time, I think both of us would agree that expert
25 modeling is the only way that companies are able to at least

1    guestimate the number of shares and enter a post lockup, unless
2    you have a really large company, as Ms. Zeiss indicated.
3            **THE COURT:**  So the low end of the damages estimate,
4    which could be as low as $20 million, assumes what?
5            **MS. ZEISS:**  The low end assumes that we were only able
6    to establish a corrective disclosure on the February date, and
7    it also took into account favorable assumptions about the
8    lockup period that shares -- maybe I have that wrong --
9    assumptions that were in the lockup period, those shares
10   traded.
11        The larger end of the range assume the two corrective
12   disclosures were established, and also that 100 percent of the
13   stock price drops were attributable to the alleged fraud.  But
14   the more likely range would obviously be what we would think
15   would be in the middle rather than at the extremes, so maybe in
16   the range of a hundred million.
17           **THE COURT:**  All right.  So the $9 million settlement
18   represents roughly about a 10 percent recovery.
19        And that then reflects various risks that you have been
20   talking about; right?
21           **MS. ZEISS:**  Yes, Your Honor.  We would obviously have
22   to establish liability, falsity, scienter, loss causation to
23   achieve that.
24           **THE COURT:**  Okay.  All right.  Well, I am satisfied
25   that in view of those risks, that what our best guesstimate at

1  this point is that this is about a 10 percent recovery, sort of
2  making a little assumption on various things, could be as high
3  as a 40-something percent recovery, could be as low as a
4  4 percent recovery.  But given the substantial risks here that
5  have been pointed out, that this number appears to be
6  sufficiently fair and adequate at least for me to render a
7  preliminary approval.  Obviously, if there are objections,
8  we'll have to consider those as we go along.
9      Some more housekeeping things.  Regarding the proof of
10 claim and the required documentation, which the proposed order
11 now reads that a claim must be accompanied by a document as
12 deemed output by the administrator of lead counsel in exercise
13 of their reasonable discretion.
14     Do we have to do anything to the settlement agreement as
15 well to echo that language, or is this good enough?
16         **MS. ZEISS:**  No, your Honor, I think this is good
17 enough.  I mean, the reality is we would do that anyway in the
18 order.  Obviously, we will comply with the order.
19         **THE COURT:**  All right.  And there's also the business
20 with respect to the request for exclusion that you have to
21 provide required information, or if the exclusion is otherwise
22 acceptable to the Court, that kind of flexibility that was
23 talked about.  You've indicated that that will be in the long
24 form notice language.  You'll add that to the long form notice?
25         **MS. ZEISS:**  Yes.  We made, on page 17 of the pdf of

1  the notice and the amended notice, we added that language:
2  "Unless otherwise ordered by the Court, and for good cause
3  shown."
4        **THE COURT:**  Okay.  All right.  And I understand the
5  termination threshold.  Do we need to also similarly say --
6  where it says, paragraph two of the agreement, again it talks
7  about the requirement of information requested, it doesn't have
8  the "unless otherwise accepted by the Court."  Is it your view
9  that we don't need to do anything to do that because it's in
10 the notice?
11       **MS. ZEISS:**  I think because it's in the notice and
12 it's also in the preliminary approval order, I don't think we
13 need to amend the supplemental agreement.
14       **THE COURT:**  All right.  So it's in the preliminary
15 approval orders.
16       **MS. ZEISS:**  It is.  It is.
17       **THE COURT:**  Okay.  Then in the long form notice you've
18 made some changes, and one suggestion I was thinking about is
19 language that says if you object but also want to be eligible
20 for payment, you still must submit a proof of claim, or you
21 will not receive payment from the settlement.  Maybe it sort of
22 says that, but maybe that could be -- this is what's in the
23 short form notice, I think, already; is that right?
24       **MS. ZEISS:**  That language should be in the long form.
25       **THE COURT:**  Is it already in the long form?

1           **MS. ZEISS:**  Oh, no, we added it.
2           **THE COURT:**  You have added that?
3           **MS. ZEISS:**  Yes.  Page 20 of the pdf of the amended
4    notice, line 14, it states:
5               "Even if you object, you can still submit a proof of
6          claim.  See question 10 to be eligible for a cash payment
7          from the settlement.  However, if you do not submit a
8          claim form, you will not receive a payment."
9           **THE COURT:**  All right.  So you think that's clear
10   enough to explain what they've got to do?
11          **MS. ZEISS:**  I do, Your Honor.
12          **THE COURT:**  All right.  I guess what I was suggesting
13   was a simpler way of rephrasing it, but it doesn't make that
14   much difference in the end.  I guess it does convey the same
15   things.
16       We notice that on the question and answer -- let's see.
17   Well, on question 8 there appears to be the word "and" missing
18   between attorneys' fees and expenses.  You might want to look
19   at that; is that right?
20          **MS. ZEISS:**  So line 13:  Court-approved attorneys'
21   fees, yes.  Oh, well, I think it reads:  "Attorneys' fees,
22   expenses, notice of administrative expenses, and taxes."
23          **THE COURT:**  Oh, so it's a series of.
24          **MS. ZEISS:**  Yeah, it's serial.
25          **THE COURT:**  All right.  Well, I'm prepared to grant

1   preliminary approval at this point.
2       And so do we have now your most recent order, form of
3   order with all the changes?
4       **MS. ZEISS:** You do.  I also have a clean one with me,
5   and clean copies of the notice if you'd like me to hand it up.
6       **THE COURT:**  Why don't you go ahead and give that to
7   our courtroom deputy, and we will review that and issue that.
8       And is there a hearing date that we need to set?
9       **MS. ZEISS:**  We need to talk about that.
10      **THE COURT:**  Okay.
11                  (pause in proceedings.)
12      **MS. ZEISS:**  CAFA notice has -- I don't know if Your
13  Honor has a date in mind.
14      **THE COURT:**  I don't yet.
15      **MS. ZEISS:**  CAFA notice has already been issued, so
16  that's not a constraint.  If the Court enters the order in the
17  next few days, we could just -- through the process of the
18  preliminary approval order, that would mean that the notice
19  would be disseminated mid March, and we could have a hearing
20  like the third week in June or, you know, sometime in June.
21      **THE COURT:**  Okay.
22      **THE CLERK:**  June 16 at 1:30.
23      **THE COURT:**  You want to give us -- let's build in a
24  little extra time just in case there's some delay.  I don't
25  want to keep changing things, so about one or two weeks after

```
 1  that.
 2          THE CLERK:  June 30th at 1:30.
 3          THE COURT:  Does that work?
 4          MS. ZEISS:  I actually won't be here.
 5          THE COURT:  Okay.  What works for you?
 6          MS. ZEISS:  Would June 23rd work?
 7          THE CLERK:  June 23rd at 1:30.
 8          THE COURT:  Okay.  All right.  So we will take one
 9  final look at this, and then get these out with that June --
10  assuming the June 23rd date.
11          MS. ZEISS:  Okay.  Great.
12          THE COURT:  Okay.
13          MS. ZEISS:  Thank you, Your Honor.
14          THE COURT:  Great.  See you then.
15          MS. MUCK:  Thank you, Your Honor.
16              (Proceedings adjourned at 2:21 p.m.)
17
18                         ---oOo---
19
20
21
22
23
24
25
```

```
 1
 2
 3                    CERTIFICATE OF REPORTER
 4         I certify that the foregoing is a correct transcript
 5   from the record of proceedings in the above-entitled matter.
 6
 7   DATE:    Thursday, March 17, 2016
 8
 9
10
11   _____
12        Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
                     Court Reporter
13
14
15
16
17
18
19
20
21
22
23
24
25
```